### MANUFACTURING CHEMISTS ASSOCIATION et al.

v.

### Douglas M. COSTLE et al.

### No. 780578.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Aug. 4, 1978.

---

970

Roberts B. Owen and Theodore L. Garrett, Covington & Burling, Washington, D. C., Gene W. Lafitte, John M. Wilson and J. Berry St. John, Jr., Liskow & Lewis, New Orleans, La., for plaintiffs.

Robert L. Ackerly, John D. Conner, Joe G. Hollingsworth and Richard A. Flye, Sellers, Conner & Cuneo, Washington, D. C., Oliver P. Stockwell, Fred H. Sievert, Jr., and Robert W. Clements, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., Timothy B. Atkeson, Steven Ailes and Allan Gates, Steptoe & Johnson, Washington, D. C., Thomas L. Raggio, Raggio, Farrar, Cappel & Chozen, Lake Charles, La., William J. Rodgers and John C. Fox, Pepper, Hamilton & Scheetz, Delancey W. Davis, Howard G. Feldman and Joseph E. Pattison, O'Connor & Hannan, Washington, D. C., Karl E. Boellert, Camp, Carmouche, Palmer, Carwile & Barsh, Lake Charles, La., for intervenor.

Frances O. Allen, Asst. U. S. Atty., Shreveport, La., Donald W. Fowler, Atty. Dept. of Justice, Joan C. Bernstein, Colburn T. Cherney, Environmental Protection Agency, Washington, D. C., for defendants.

## OPINION

VERON, District Judge.

This action challenges certain regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to Section 311 of the Federal Water Pollution Control Act, ("the Act") 33 U.S.C. § 1321, as amended by the Clean Water Act of 1977, P.L. 95–217, 91 Stat. 1566. Published at 43 Fed. Reg. 10474 and promulgated as 40 C.F.R. Parts 116, 117, 118 and 119, these regulations identify some 271 chemicals as "hazardous substances" and thereby trigger a comprehensive reporting, liability and cleanup scheme for discharges of hazardous substances from offshore facilities, vessels and onshore facilities, including motor vehicles and rolling stock. (These regulations were originally intended to go into effect on June 12, 1978. However, on May 30, 1978, EPA amended the challenged regulations to delay their implementation until August 11 only insofar as they apply to chemical manufacturers whose operations are already regulated by the permit system established under § 402 of the Act. The amendments to section 118.1 of the original regulations were published on June 5, 1978 at 43 Fed.Reg. 24309.) Plaintiffs filed their complaint on May 11, 1978, and filed a motion on May 19 seeking a preliminary injunction against enforcement of the regulations pending the outcome of this litigation. Oral arguments on that motion were presented on June 2, and a preliminary injunction was granted on June 8, D.C., 451 F.Supp. 902. Since then, all parties have stipulated that the merits of the instant action could best be resolved in the form of motions for summary judgment (under Rule 56 of the Federal Rules of Civil Procedure). The present motions are based on both the public record of the administrative proceedings which were certified by the EPA on June 19, 1978 and on the various affidavits offered by the parties along with their voluminous briefs. We heard oral arguments on the motions for summary judgment on July 24. The court has carefully considered all briefs, exhibits and arguments which have been presented both for the instant motions and in support of the earlier motion for preliminary injunction in arriving at its decision.

Plaintiff/Manufacturing Chemists Association ("MCA") is a nonprofit trade association of 196 member companies representing more than 90% of the production capacity of basic industrial chemicals in the United States. The individually-named plaintiffs are members of MCA and are engaged in the production of basic industrial chemicals throughout the country. (A number of facilities which will be affected by the challenged regulations are located in or near the city in which this court sits.) Intervenors/Association of American Railroads, et al. ("AAR"), represent the interests of those involved in daily transportation of massive amounts of "hazardous substances" over the nation's railroad network. Intervenor/The Fertilizer Institute ("TFI") represents fertilizer manufacturing companies many of which, it is asserted, would be adversely affected should the challenged regulations be implemented. Intervenor/Mississippi Lime Company ("ML") produces lime and ships a substantial portion of its product by barge on the Mississippi Ohio and Illinois Rivers. Since issuance of the EPA regulations the barge lines used by ML for shipping its products have informed ML that they will not accept lime for shipment since they cannot obtain insurance against the penalties that are applicable to spills of substances which EPA designates as hazardous. Intervenors/American Waterways Operators, Inc., et al. ("AWO") are a trade association of barge operators and several individual barge and towing companies substantially engaged in the transportation of chemicals listed as "hazardous substances" in the EPA regulations. Defendants/Douglas M. Costle and the EPA have promulgated the regulations herein considered. Our jurisdiction in this matter is based on 28 U.S.C. §§ 1331(a), 1337 and 1361. The amount in controversy exceeds $10,000.00.

Plaintiffs' motion for summary judgment, put very simply, rests on the assertion that the regulations promulgated by EPA under Section 311 are arbitrary and

capricious and contrary to the underlying statutory mandate. It is therefore urged that this court find the regulations legally invalid, and grant a permanent injunction to prevent their implementation and enforcement. Defendants, on the other hand, argue that the regulations are a valid and enforceable result of the rulemaking powers and practices of an administrative agency. It is contended that this court's authority to review administrative actions is extremely limited in scope and that the regulations, though perhaps not as rational as they could be, certainly meet the threshold tests for validity. Defendants have also brought a Motion to Strike Exhibits, asking that this court refuse to consider any exhibits offered by plaintiffs which were not a part of the administrative record considered by the EPA in developing the regulations.

In our opinion of June 8 we discussed the philosophical considerations inherent in judicial review of administrative determinations. Since we believe those considerations are equally relevant in the instant motion we feel it appropriate to quote at length from that opinion:

"In reviewing the challenged regulations the court is mindful of the far-reaching implications of its decision in the unending fight to preserve and protect both our industry and our environment. We cannot but agree fully with the underlying rationale of the National Environmental [Protection] Act of 1969 as enunciated by the staffs of two separate Congressional Committees:

'Alteration and use of the environment must be planned and controlled rather than left to arbitrary decision. Alternatives must be actively generated and widely discussed. Technological development, introduction of new factors affecting the environment, and modifications of the landscape must be planned to maintain the diversity of plants and animals. Furthermore, such activities should proceed only after an ecological analysis and projection of probable effects. Irreversible or difficultly reversible changes should be accepted only after the most thorough study.' Staffs of Senate Comm. on Interior & Insular Affairs & House Comm. on Science & Astronautics, Congressional White Paper on a National Policy for Environment, 90th Cong., 2d Sess., 18 (Comm. Print 1968).

"There are, of course, widely divergent opinions as to the role that the judiciary should play in reviewing administrative determinations. On the one hand, the New Deal philosophy fostered a belief in the necessity of judicial deference to the administrative process because of the expertise which would be gained by experience. For example:

'First, we expect judicial review to *check* —not to *supplant*—administrative action. Review must not be so extensive as to destroy the values—expertness, specialization, and the like—which, as we have seen, were sought in the establishment of administrative agencies.' U.S. Attorney General's Committee on Administrative Procedure, Administrative Procedure in Government Agencies 77 (1941).

As a result, faith in expertise led to a conception of the administrative process as one of management where it is more important that the right solution be reached than that the process be fair. (See J. Landis, The Administrative Process 39 (1938), and Jaffe, James Landis and the Administrative Process, 78 Harv.L.Rev. 319 (1964).

"On the other hand, new theories have focused on the use of judicial intervention both as a means of opening existing processes to more democratic influences and as a means of substantive control over administrative actions. Thus:

'The criticism of broad grants of administrative discretion to act in the public interest harks back to Professor Dicey's thesis that such discretion is inconsistent with the rule of law. Dicey wanted claims between the individual and the state adjudicated not in administrative tribunals (as was the case in France), but by general jurisdiction judges who would, in his view, be sensitive to the protection of the individual against arbitrariness.' Hanks, Tarlock and Hanks, Environmental Law and Policy (1975) at 85.

"In any event, administrative decisions must be closely scrutinized to ensure proper implementation of the policies espoused by Congress in granting certain powers to the various administrative bodies. In the final analysis, David Sive has argued convincingly:

'it is believed that in any environmental controversy involving the weighing of conflicting values, the weigher should be a court, a generalist, rather than an administrative agency whose outlook is organically developmental and provincial.' Sive, The Role of Litigation in Environmental Policy: The Power Plant Siting Problem, 11 Natural Res.J. 467, 471 (1971)."

The standards for reviewing a motion for summary judgment are well established. Rule 56(c) states:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The purpose of Rule 56 is to eliminate trials which are unnecessary and which might result in delay or expense which would operate to defeat the expeditious termination of an action. "[I]f it is not clearly established that there is no dispute as to the facts which would justify judgment for one of the parties, then the court may not properly grant him judgment, *even though each side has moved for summary judgment in his favor*." Moore, *Federal Practice* ¶ 56.13. (Emphasis added) Summary judgment appears to be an especially valuable tool in cases such as the one at bar.

"[T]he summary judgment procedure may be peculiarly appropriate in an action to enjoin or enforce an administrative order because of the type of review provided by statute. Thus in an action to enjoin the enforcement or otherwise obtain review of an administrative order where the plaintiff has no right to a trial de novo, but is limited to a review of the record before the agency and this record is before the court, the case is ripe for summary disposition, for whether the order is supported by sufficient evidence, under the applicable statutory standard, or is otherwise legally assailable, involves matters of law." Moore, ¶ 56.17[3].

In light of the nature of the instant action, and considering the proceedings which have already taken place in this court, we find that the case at bar is well suited for utilization of the summary judgment mechanism available to us and that there is, indeed, "no genuine issue as to any material fact."

In deciding the issues raised in the instant motion for summary judgment we must first determine the scope and standard of judicial review in cases involving administrative determinations. The statutory test to be applied in determining whether an agency's actions are to be overturned is found in § 706 of the Administrative Procedure Act (5 U.S.C. § 706):

"To the extent necessary to decisicn and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

'(1) compel agency action unlawfully withheld or unreasonably delayed; and

'(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

'(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

'(B) contrary to constitutional right, power, privilege, or immunity;

'(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

'(D) without observance of procedure required by law;

'(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

'(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.'

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

Defendants have discussed the scope of judicial review in depth and we therefore quote extensively from their brief:

"The regulations at issue here were adopted as an exercise of informal rulemaking. The standard of review of such rulemaking is well settled. Because the decisions of an agency are 'entitled to a presumption of regularity,' *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971), those decisions must be upheld unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 401 U.S. at 416 [91 S.Ct. 814]. In making that determination, 'the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' Although the court's inquiry is to be searching, 'the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.' 401 U.S. at 416 [91 S.Ct. 814]. Plaintiffs thus bear a 'heavy burden' of demonstrating the irrationality of an agency's decision. *United States v. Ekberg,* 291 F.2d 913, 921 (C.A.8, 1961), cert. denied, 368 U.S. 920 [82 S.Ct. 242, 7 L.Ed.2d 135] (1961).

"In addition, in conducting its review, the Court is limited to the 'administrative record that was before the [Administrator] at the time he made his decision,' *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 420 [91 S.Ct. 814], 'not some new record initially made in the reviewing court.' *Camp v. Pitts,* 411 U.S. 138, 142 [93 S.Ct. 1241, 36 L.Ed.2d 106] (1973). *Accord, Moretti v. Hoffmann, supra,* 526 F.2d [1311] at 1312 (C.A.5, 1976); *Gables by-the-Sea v. Lee,* 365 F.Supp. 826 (S.D.Fla.1973), affirmed, 498 F.2d 1340 (C.A.5, 1974) . ."

"Moreover, while the regulations must include a statement of basis and purpose containing sufficient explanation of the agency's analysis and reasoning to enable a reviewing court to perform its review function, *Amoco Oil Company v. EPA, supra,* 501 F.2d at 739, an agency is not required in rulemaking proceedings to abide by the same stringent requirements of fact findings and supporting reasons which apply to adjudication. *Florida Sugar Cane League, Inc. v. Usery,* 531 F.2d 299, 303 (C.A.5, 1976); *General Telephone Co. of Southwest v. United States,* 449 F.2d 846, 862 (C.A.5, 1971). Indeed, while a court 'may not supply a reasoned basis for the agency's action that the agency itself has not given,' it must 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–6 [95 S.Ct. 438, 42 L.Ed.2d 447] (1974). As the Third Circuit recently noted, '[i]n conducting this review, we will not overturn agency action because the underlying reasoning is not fully set forth, if we can fairly discern the basis for the action.' *American Iron and Steel Institute v. EPA,* 568 F.2d 284, 296 (C.A.3, 1977). *Accord, Florida Sugar Cane League, Inc. v. Usery, supra; American Meat Institute v. EPA,* 526 F.2d 442, 453 (C.A.7, 1975); *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620, 632 (C.A.2, 1976).

"Finally, where issues of statutory interpretation are involved, great deference is to be given the interpretation adopted by the Administrator. This principle, long established, was recently restated by the Supreme Court in upholding, as against the contrary view of several courts of appeals, the Administrator's interpretation of the Clean Air Act:

'Without going so far as to hold that the Agency's construction of the Act was the only one it permissibly could have adopted, we conclude that it was at the very least sufficiently reasonable that it should have been accepted by the reviewing courts.'

*Train v. Natural Resources Defense Council,* 421 U.S. 60, 75 [95 S.Ct. 1470, 43 L.Ed.2d 731] (1975). *Accord, E. I. duPont v. Train,* 430 U.S. 112, 134–5 [97 S.Ct. 965, 51 L.Ed.2d 204] (1977); *Udall v. Tallman,* 380 U.S. 1, 16 [85 S.Ct. 792, 13 L.Ed.2d 616] (1965); *Ethyl Corporation v. EPA* [176 U.S.App.D.C. 373, 384] 541 F.2d 1, 12 n. 16 (C.A.D.C., 1976) (*en banc*), *cert. denied,* 426 U.S. 941 [96 S.Ct. 2662, 49 L.Ed.2d 394] (1976)."

■ In light of the standard as enunciated above it is clear that the court is limited (in the vast majority of cases) to the administrative record itself when deciding on the propriety and legality of an agency's ruling. We therefore grant defendants' Motion to Strike Exhibits. We now hold that the regulations at issue here must stand or fall in the context of the information and exhibits which were before the EPA when promulgating the regulations now being challenged. No other exhibits, whether offered by plaintiffs, intervenors or defendants in the instant action, can or should be considered by this court in reaching its ultimate decision on the merits.

Plaintiffs have mounted three separate attacks on the validity of EPA's regulations. Victory in any one of these attacks would spell immediate success for plaintiffs in this action, while defendants must prevail on all issues if they are to prevail in the case at bar. All parties have requested that this court make findings and conclusions with respect to all three issues (even if it becomes technically unnecessary to decide one or two of them) in order to more clearly delineate the paths of our reasoning here, since that reasoning will certainly be referred to and relied upon either in future appeals or in the developing of new regulations (whatever events may be the result of our decision here). The court will therefore proceed in that manner.

## I.

Plaintiffs first attack EPA's selection of the one pound unit (and multiples thereof) for purposes of determining "hazardous quantities" as both contrary to the statutory mandate and arbitrary and capricious.

The court's opinion of June 8, 1978, discussed this issue at length and concluded that plaintiffs were likely to prevail on the merits, should that issue be raised at trial. (Such a finding was an integral and necessary part of our decision to grant a preliminary injunction.) Defendants vehemently disagreed with our conclusions on that issue. Though they have argued ably and well, counsel for defendants have raised nothing either in their briefs or at the most recent oral arguments which has convinced us that our earlier decision on this issue was in error. We therefore quote at length from our prior opinion concerning this matter:

". . . Section 311(b)(3) of the Act prohibits discharges of hazardous substances 'in harmful quantities' into navigable waters. Violations of this provision give rise to penalties, an obligation to notify the appropriate federal agency, and liability for the cost of removal under Sections 311(b)(5), (6) and (f). Determination of a 'harmful quantity' is critical to the implementation of the remedial provisions. Section 311(b)(4) defines 'harmful quantities' and directs the EPA to determine:

'those quantities of . . . any hazardous substance the discharge of which, *at such times, locations, circumstances and conditions,* will be harmful to the public health or welfare.' (Emphasis added).

The EPA's attempt to implement this directive is found in Part 118 of the final regulations. The list of 271 hazardous substances is divided into 5 categories based upon their relative toxicity. EPA then chooses one pound (the smallest common commercial container size) as the 'harmful quantity' for all substances in the most toxic category. Larger multiples of the one pound unit are then applied to the remaining categories in ascending order as their toxicity decreases. Thus, a discharge of one pound of a substance in category 'X' is deemed to be 'harmful' for purposes of triggering the provisions regarding penalties and notification, while those who discharge 10 pounds of a substance in category 'A'

(that category of substances slightly less toxic than those in category 'X') or 100 pounds of a substance in category 'B' (a group of substances which are still less toxic) will find their actions subject to the same provisions. All such quantities must have been discharged within a 24 hour period.

"The final regulations, on their face, do not appear to comport with the statutory mandate. Nowhere in Part 118 do we find reference to the considerations specifically required by Section 311(b)(4). Such factors as 'times, locations, circumstances and conditions' are not mentioned, nor can their influence be found in the 'one pound' rule. As counsel for the plaintiffs aptly noted, the choice of a 'one pound bottle' as the basic unit of trade by the chemical industry was the result of many different considerations, none of which concerns the impact of the chemical within the container on the environment. Packaging, marketing, pricing and easy use of products (the factors normally taken into account by manufacturers) have no relationship to the purposes or intentions of the Act and regulations. It would appear, then, that the EPA has not complied with the statutory requisites in promulgating the challenged regulations.

"The considerations enumerated by Congress were prompted by what was thought to be a rational method for determining actual environment harm. If the challenged regulations fail to comply with that underlying purpose, they risk being found invalid because they are arbitrary and capricious. In the words of the EPA itself:

'The harm produced by the introduction of any pollutant to water is dependent upon the resulting concentration of that material in the water and upon receiving water characteristics. Determining harmful quantities thus requires some evaluation of probablistic damage or harm to representative water bodies.' (Preamble to 1975 proposed EPA regs. 40 Fed.Reg. 59985.)

The harm that will result from the discharge of a given amount of a hazardous substance may be determined as much by characteristics of the receiving water body as by the toxicity of the substance itself. Conditions of the receiving body which will have an impact on the concentration of the pollutant include type, flow rate and size of the water body, and salinity, hardness, alkalinity, biological population and buffering capacity of the water.

"In developing its proposed regulations, EPA employed Battelle Memorial Institute of Pacific Northwest Laboratories ('Battelle'). Battelle attempted to develop a system for determining the hazard presented by the discharging of various substances based on 'critical concentrations' (concentrations at which substantial harm could be expected), 'critical volumes' (referring to volumes of receiving waters that would be affected), and 'harmful quantities' which would cause critical concentrations if discharged into a body of water. Different 'harmful quantities' for each substance were determined depending on whether the receiving body was fresh water, an estuary, or coastal water. In making its determinations, Battelle attempted to develop a system which would be workable both for the EPA and for those being regulated. The EPA rejected the Battelle report in favor of its own 'one pound' system. The EPA explained that it had rejected approaches such as the one proposed by Battelle because of their:

'excessive complexity; incomplete or conflicting data; difficulty visualized in implementation.' (40 Fed.Reg. 59985)

"Counsel for the EPA argued that the harmful quantity test finally adopted by the regulations was chosen because it was 'clear and easily comprehensible' and was therefore more easily understood by all interested parties. Counsel also urged that the 'one pound' test would be an effective incentive for compliance with the notification requirements of Section 311. While it is conceivable that the test finally selected may accomplish the ends urged by the EPA, such goals should not be attained through totally arbitrary means. The Acting Chief of the U. S. Coast Guard Office of Marine Environment and Systems accurately de-

scribed the 'one pound' rule chosen by the EPA:

'The method for determining harmful quantity of hazardous substances, while having some merit in its simplicity, ignores the relationship between quantity discharged and the receiving water and *has no sound technical basis.*' (Letter from Capt. D. J. Riley to EPA on March 25, 1976, Plaintiffs' exhibit # 14, emphasis added.)

"In order for a statutory system intended to control pollution to have any reliability and legitimacy, the tests which form the underpinnings of that system must have some rational relationship to the harm sought to be prevented. It must also treat all citizens who discharge under similar circumstances with a certain degree of uniformity. Such is not the case in the challenged regulations. First, even the EPA itself does not contend that the values chosen for enforcement of the regulations represent discharges which are harmful in fact. It simply contends that the values are easier to use than any other test developed."

Counsel for EPA did argue, at the hearing on July 24, that the values chosen had some relationship to actual harm, though not in every case. Under such circumstances we must conclude that any relationship between actual harm and the prohibited amounts of discharge in the new regulations may well be only coincidental.

Further quoting from the court's prior opinion:

". . . Second, the regulations, as finally promulgated, draw an unreasonable distinction between chemical manufacturers operating with a valid NPDES permit and those without a permit. Under the regulations, a manufacturer who applies for an amended permit (or who has been granted a permit) may discharge hazardous substances in amounts far in excess of the quantities which the EPA has deemed to be hazardous without in any way triggering the notification and penalty provisions. On the other hand, a manufacturer discharging exactly the same amount of the same hazardous substances under exactly the same

circumstances may be fined heavily if it has failed to apply for a permit or if its permit has expired. (It should be noted that this disparity in enforcement cannot be justified as an incentive to manufacturers to obtain valid permits since Section 402 contains its own penalty provisions covering failures to apply for or comply with a permit.)" [The relationship between Sections 311 and 402 will be dealt with at greater length later in this opinion.]

". . . In essence, defendants urge that the 'one pound' test was adopted because any more complicated test would raise insurmountable obstacles to uniform implementation and enforcement:

'The discharger, particularly from a transportation source, is not equipped to differentiate between large and small streams, estuaries and rivers, or rivers and lakes. Adoption of such an approach using variable harmful quantities depending on water body type or size would place dischargers in the position of facing criminal penalties for failure to immediately notify without having the means to make the determination that a violation has occurred . . .. The proposed approach, identifying a single harmful quantity applicable to all waters, provides a clear and definitive threshold for activation of the reporting requirement. The inclusion of numerous variables which may accompany a particular discharge and modify the harmful quantity would create uncertainty in the notification requirement which is unacceptable in light of the criminal penalties provisions . . . and the importance of prompt activation of response activities through such notice.' 43 Fed.Reg. 10491.

The court does not agree. The distinction between fresh water, estuaries, and coastal waters proposed by the Battelle report was a valid and workable first step in taking into consideration circumstances beyond the weight of the discharged substance. Further, the EPA could accomplish its avowed purpose of requiring compliance with the notification provisions for all substantial discharges by developing a two-stage proc-

ess. Stage one could require notification after any discharges of hazardous substances in amounts exceeding the 'hazardous quantities' now proposed as part of the 'one pound' regulations. The second stage would trigger the penalty provisions based on an in-depth consideration of 'times, locations, circumstances and conditions' in a manner which may or may not be similar to the methods recommended by Battelle. The court recognizes that its function in reviewing challenged administrative actions is not to suggest how the administrative body might have better attained its goals and implemented the underlying Congressional policies. However, the alternatives which are proposed here, when compared with the standards finally adopted by the EPA, indicate that the EPA's final regulations may well be arbitrary and capricious and have failed to carry out the policies of the statute under which they were promulgated."

For the foregoing reasons we now hold that the "one pound" method of determining "hazardous quantities" is, in fact, arbitrary and capricious and contrary to the statutory mandate. Even if plaintiffs had based their attack on the regulations solely on this issue we would conclude that the regulatory system developed by the EPA is legally invalid and that its final implementation must be permanently enjoined.

## II.

Plaintiffs further urge that the method in which EPA treated the question of "removability" of the "hazardous substances" (for purposes of applying two different sets of penalty provisions) was arbitrary and contrary to the statute. As we understand the basic intent of Congress and the statute, two systems of penalties were established and were to act as deterrents against the discharge of any "hazardous substances." Sections 311(c) and (f)(2) provided that any discharge of hazardous substances, in an amount deemed to be harmful to the environment, would be met with an effort to clean up or mitigate the harmful effects of such a discharge. The cost of such efforts would be borne by the spiller or discharger, up to the limit of $50 million dollars.

At the same time, however, it was clear that certain of these substances immediately dissolved in water and any attempts to remove them or mitigate the resulting damage after discharges would be completely unsuccessful. For spillers and dischargers of that type of substance Section 311(b)(2)(B)(iii) set up a structure of special penalties which would act as a deterrent in cases where the "clean-up liability" would obviously not do so. It therefore became necessary for the EPA to determine which of the 271 "hazardous substances" were "removable" and which ones were not in order to determine which of the parallel systems of penalties was applicable in a given spill or discharge situation.

The EPA, relying on the words "actually being removed" found in Section 311(b)(2)(B)(i), decided that Congress intended for it to determine which substances could be physically removed from the water into which it had been discharged, and that those substances which could not be so removed were to be subject both to the clean-up cost penalty (to cover any expense resulting from efforts to mitigate the effects of the "non-removable" substance upon the water and the environment) and to the special penalties which serve as deterrents to discharges of non-removable substances. The EPA therefore concluded that it would treat the ten substances which had characteristics similar to oil (which is actually removable from water under certain circumstances) to be found on the list of 271 "hazardous substances" as being "removable" for purposes of Section 311(b)(2)(B) and would treat the remaining 261 substances as "non-removable" when applying the relevant penalty provisions.

We will not discuss or decide here whether the scientific data which may or may not have been considered by the EPA in deciding which of the 271 substances was similar to oil were sufficient for that purpose. Rather, we do not believe that the EPA properly defined or applied the term

"removable" in making its determinations and we find the resulting regulations to be arbitrary and therefore invalid on that basis. Section 311(a)(8) defines the terms "remove" and "removal" to include:

> ". . . removal of the oil or hazardous substances from the water and shorelines or the taking of such other acts as may be necessary to minimize or mitigate [the] damage to the public health or welfare . . ."

A rational and reasonable reading of this definition, coupled with what we believe to be the clear intent of Congress to set up two parallel and independent systems of penalties, leads inexorably to the conclusion that a standard of "removability" must not be limited to actual physical removal from a receiving water body. Rather, mitigation of harm, through neutralization of a harmful substance, fits squarely within the statutory definition of removability.

A letter of February 18, 1976, from Senator Edmund Muskie, a sponsor of the 1972 legislation, is in accord with this conclusion. (The letter is part of the administrative record). Senator Muskie criticized EPA's approach to the removability question, pointing out that the special penalty provision was enacted by Congress to serve as a deterrent to discharges of substances the effects of which are not mitigable and not subject to liability for cleanup costs. Muskie concluded:

> "Unfortunately, EPA's regulations on this subject are deficient in two important respects. First, they do not make a distinction between those hazardous substances which can and those which cannot be removed from water. The statute clearly intended that this distinction be made in order to determine whether a spill of a hazardous substance would be subject to a clean-up liability provision or the deterrent penalty provision."

We therefore find that the EPA's decision to ignore mitigability in determining "removability" of "hazardous substances" was arbitrary and capricious and contrary to the statutory mandate of Section 311. This court recognizes that it is not practicable to develop a totally accurate scheme for determining mitigability of harm for all substances, under all circumstances and for every conceivable type of spill or receiving water body. Some consideration must be given to this factor of "removability," however. It cannot be cavalierly disregarded. To ignore it, as was done by the EPA in developing its final regulations, is to give rise to a system of penalties which fulfills not in the slightest the original legislative intent.

## III.

The final issue raised by the parties for decision in the case at bar is the interrelationship (or lack thereof) between the control of discharges of "hazardous substances" under Section 311 and the already existing NPDES permit system for continuous industrial discharges established under Section 402 of the Act, 33 U.S.C. § 1342. EPA has taken the position that those continuous dischargers currently operating under valid NPDES permits (most of those permits being silent with regard to the amount of any of the 271 "hazardous substances" that may permissibly be discharged) must file applications for amended permits. These applications would, in themselves, delay the immediate enforcement of Section 311 against industrial dischargers until the NPDES permit agency has had an opportunity to evaluate the application and issue an amended permit which would include specific limitations concerning discharge of the 271 substances. It is still unclear what would be the source of these specific limitations since "guideline regulations" normally relied upon by the permit agencies in issuing permits as yet have not been developed for the newly designated "hazardous substances." Finally, EPA contends that any discharger which receives the required amended permit would be subject to the penalty provisions under both Sections 311 and 402 should it suffer the misfortune of not complying with its new permit. (Indeed, it is urged that the penalties under Section 311 would be based on the total amount of the offending discharge rather than simply on

the amount of the discharge which exceeds the limitations set by permit.)

Plaintiffs' opinion is diametrically opposed to the one espoused by EPA. First, it is argued that EPA has no authority under Section 311 to require holders of permits to apply for amended ones. This position, it is urged, is supported by the apparent provision in the Section 402 permit structure which indicates that once a permit is issued the permittee is entitled to assume that so long as it complies with the requirements of its permit it may assume that no new limitations will be placed on its discharges during the lifetime of its permit. Second, plaintiffs assert that the penalties in Section 311 are in no way related to the permit system and should not be applied to violations of NPDES permits.

■ Having considered the relevant statutory provisions this court concludes that EPA does, in fact, have the limited authority to require applications for amended permits. Section 402 provides for changes in permits and the enforcement of more stringent controls over discharges, even during the life of an existing permit, in cases where circumstances have changed since the issuance of the original permit. We find that the designation of 271 substances as "hazardous" is just such a change in circumstances as would give rise to allowable changes in permit requirements. However, those new limitations must be issued and implemented in a manner which is reasonable and fair, and which attempts to cause as little economic inconvenience to the dischargers whose permits are being revised as is possible under the circumstances. For example, the EPA would certainly be ill advised if it were to simply apply its "harmful quantities" from Section 311 to the amended NPDES permits without closely studying the "best practicable control technology." Further, we would expect EPA to delay issuing amended permits until new "guideline regulations" have been developed for at least the most hazardous substances in order to guarantee uniformity of discharge requirements for those substances. Finally, a reasonable amount of time would have to be granted for purposes of monitoring discharges and preparing applications for amendments.

■ Deciding that a better designed and developed set of regulations could validly require holders of NPDES permits to apply for amended permits does not mean, however, that violation of those amended permits (or of the already existing permits which happen to mention any of the 271 new "hazardous substances") properly would be met with penalties arising both under Section 311 and Section 402. The latter statute contains a detailed system of penalties to be applied to those who fail to comply with their permits. The reporting provisions and financial penalties found in Section 402 act as sufficient deterrent to the undesirable activities and would make application of the penalties under Section 311 redundant and wholly unnecessary.

■ Further, the rational underpinnings for the limitations to be found in NPDES permits are completely different from those which form the bases of the new regulations. The penalty systems should therefore be maintained as separate and distinct entities. NPDES limitations are founded upon the ascertainment of the "best practicable control technology" which can be applied to relevant discharges coming from relevant industries. Considerations of "harm to the environment" are indirect and subliminal at best. Conversely, environmental harm is of paramount importance within the Section 311 scheme. It would therefore seem unreasonable to penalize a permit violator under both statutory frameworks. (Even if Section 311 were to be applied such penalties should certainly be applied only to the amount of discharge which exceeded the total amount allowed by permit.) This court concludes that the only rational course would be to require applications for amended permits to be filed (through a more reasonable and ordered process) and then to penalize permit violations solely under the provisions of Section 402.

## CONCLUSION

For the foregoing reasons the court now holds that the regulations promulgated by defendants under Section 311 and attacked in the instant action are arbitrary, capricious and contrary to the relevant statutory pronouncements and are therefore legally invalid. Plaintiffs' request for a permanent injunction preventing the implementation and enforcement of those regulations is therefore granted. In light of our holding concerning the regulations' validity we find it unnecessary to reach or decide upon the several issues raised by the various Intervenors.

At the conclusion of our opinion of June 8, 1978, we voiced our concern that that decision not be misinterpreted. We believe that the need to approach the serious problem of pollution in this nation is of primary importance, and that it must be approached with a sense of urgency, albeit tempered with reason and understanding, by members of all levels of our society. It is with a feeling of deep commitment and concern that we quote from our earlier opinion:

"We do not view this decision as a victory for those who would pollute our waters with impunity (as some might interpret it) nor as a defeat for those who are fighting the worthy battle to protect our environment. No one could possibly be happy with a system which produces goods at the ultimate expense of the health and well-being of the inhabitants of our planet.

'The essential measure of the success of the economy is not production and consumption at all, but the nature, extent, quality, and complexity of the total capital stock, including in this the state of the human bodies and minds included in the system.' Boulding, The Economics of the Coming Spaceship Earth, in Environmental Quality in a Growing Economy 3–14 (H. Jarrett ed., 1971)

Rather, we are concerned solely and completely with ensuring that regulations promulgated by a governmental body which are aimed at controlling the activities of private businesses and citizens have been developed in compliance with the relevant legislative policies and pronouncements in the area and in a manner which is not arbitrary and capricious."