**FLORIDA SUGAR CANE LEAGUE, INC., Plaintiff-Appellant,**

v.

**W. J. USERY, in his capacity as Secretary of Labor, United States Department of Labor, et al., Defendants-Appellees.**

No. 75–3286.

United States Court of Appeals, Fifth Circuit.

May 10, 1976.

Charles Kelso, Atlanta, Ga., Joseph W. Beasley, Miami, Fla., for plaintiff-appellant.

Carl W. Gerig, Jr., Counsel for Manpower Litigation, U. S. Dept. of Labor, Washington, D. C., with whom William J. Kilberg, Sol. of Labor, Craig A. Berrington, Associate Sol., Washington, D. C., Beverley R. Worrell, Regional Sol., Atlanta, Ga., and Steven M. Guttell, U. S. Dept. of Labor, Washington, D. C., were on brief for defendants-appellees.

Michael Masinter, Fla. Rural Legal Serv., Inc., Homestead, Fla., Katherine Gruenheck, Migrant Legal Action Program, Inc., Washington, D. C., William L. Botts, III, Fla. Rural Legal Serv., Inc., Belle Glade, Fla., amicus curiae.

Before DYER and CLARK, Circuit Judges, and KRAFT [*], District Judge.

DYER, Circuit Judge:

The Florida Sugar Cane League appeals the district court's denial of an injunction against the Secretary of Labor's publication of an "adverse effect wage rate" for sugar cane in Florida. 40 FR 20750, June 26, 1975, notice proposing annual revision of 20 C.F.R. § 602.10b(a)(1). Within the contours of our review of administrative rule-making, we find no error in the denial of an injunction.

The League represents Florida sugar cane growers, who import temporary foreign workers to harvest the Florida sugar cane crop. Over the years the Florida sugar cane industry has used nonimmigrant aliens from the West Indies to work as temporary agricultural laborers. This employment practice is regulated by a

> complex statutory structure designed to facilitate the employment of domestic workers for seasonal agricultural labor, and to permit the use of foreign nationals temporarily admitted to the United States to work for a specific employer if domestic workers are unavailable.

*Elton Orchards, Inc. v. Brennan*, 1 Cir. 1974, 508 F.2d 493, 495.

Aliens are permitted by statute to enter the country as "nonimmigrants" to work only "if unemployed persons capable of performing such service or labor cannot be found in this country." The Immigration and Nationality Act, § 1101 et seq., 8 U.S.C.A. § 1101(a)(15)(H)(ii). The entry of these nonimmigrants is authorized "after consultation with appropriate agencies of the Government" by a determination of the Attorney General that this statutory condition precedent has been satisfied. 8 U.S.C.A. § 1184(c). The immigration regulations under this title specify that the requisite "consultation" be shown in the form of

> "[e]ither a certification from the Secretary of Labor . . . stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed, or a notice that such certification cannot be made . . ." 8 C.F.R. § 214–2(h)(3).

Thus, from this multi-tiered scheme of delegated statutory authority, ultimately it is the Secretary of Labor who is responsible

---

[*] Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

for whatever fact finding and evaluation are necessary to effectuate the statutory purpose of protecting domestic workers' right to work. The procedures and requirements pertinent to requests for certification are thus governed by regulations rather than by statute. Labor Department regulations outline the general certification procedure to be performed whenever requested by an employer seeking to employ temporary foreign workers. 20 C.F.R. § 602.10.

The central conclusion to be contained in the certification is "that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed . . . " 20 C.F.R. § 602.10(a). The Secretary insures that domestic workers will not be adversely affected, by means of setting an annually revised "adverse effect wage rate" for specific states. 20 C.F.R. § 602.10b(a)(1). Agricultural employers seeking certification to import foreign workers must first file with the state employment service an offer of employment to U. S. workers at a wage rate not less than these "adverse effect wage rate"s. 20 C.F.R. § 602.10(b), § 602.-10(a)(j). Neither the statute nor the regulations establish a formula for the Secretary's computation of the "adverse effect wage rate." However, the regulations do require that

> Where the prevailing rate for a crop activity in an area of employment is higher than the wage rate otherwise applicable under paragraph (a)(1) of this section, such higher prevailing rate shall be offered and paid.

20 C.F.R. § 602.10b(b).

The League objects to the manner of determination of the adverse effect wage rate used by the Secretary of Labor for the 1975–76 harvest year as arbitrary and capricious. The League makes two main arguments to support its contention that the $2.84 rate designated by the Secretary as the 1975 rate was too high: (1) the rate is the result of the Secretary's deviation from the historically applied customary formula, adopted without any explanation of reasons for the deviation; (2) that rate could be reached only through the improper consideration of a base rate derived from criteria of other statutes, thus exceeding the Secretary's authority under the Immigration and Nationality Act.

No one disputes that there are insufficient domestic workers available to harvest the Florida sugar cane crop. There is no dispute before us as to the need for certification. Rather, we are asked to review the reasonableness of the method by which the Secretary calculated the wage rate prerequisite to certification. At least since 1968 the Secretary has computed an annual revision of the adverse effect wage rates by means of the application of a mathematical formula to the prior year's adverse effect wage rates ("the formula rate"). By this customary formula the prior year's rate is increased by the percentage change in that state's hourly farm wage reported by the United States Department of Agriculture (the USDA rate).[1]

However, even before the current controversy over the 1975 rate, the method of its calculation had been necessarily varied. For, overlaid on the Labor Secretary's ongoing annual determinations (of the formula rate) was a distinctly separate, parallel wage rate determination made by the Secretary of Agriculture. The Sugar Act of 1948 provided for a minimum wage to be paid all sugar cane workers as a *quid pro quo* condition for such employers to receive the benefit of federal subsidy payments. 7

---

1. A general description of the Secretary of Labor's historical formula was published in "Farm Labor" the report of the Crop Reporting Board, Statistical Reporting Service, United States Department of Agriculture:

   *Statement of Procedure for Formulating Adverse Effect Wage Rates*

Since 1968, the adverse effect wage rates have been adjusted annually by applying the State by State percentage change in the annual average USDA hourly farm wage (without board or room). The percentage change of the USDA rate is applied to the adverse effect rate of the prior year in order to determine the adverse effect rate of the current year.

U.S.C.A. §§ 1100 *et seq.*; 7 C.F.R. Part 863.[2]

For some years, the Secretary of Labor published its adverse effect wage rate (the formula rate) even though the Sugar Act "fair and reasonable" wage rate was always higher than the formula rate. Because the specific statutory rate governing sugar alone was "higher than the wage rate otherwise applicable", the Sugar Act wage rate, as "the prevailing rate for a crop activity" became the legal minimum wage required to "be offered and paid." 20 C.F.R. § 603.10b(b). In 1971 the Secretary of Labor determined there was no longer any need to publish an adverse effect wage rate: that it had become superfluous because the Sugar Act rate was always the higher of the two. There is no dispute that the Secretary has not published adverse effect wage rates for Florida since 1971, until the contested rate of 1975, although the unpublished formula rate for the year of 1975 would have been $2.31.

**2.** 7 U.S.C.A. § 1131(c) requires

That all persons employed on the farm in the production, cultivation, or harvesting of sugar beets or sugar cane with respect to which an application for payment is made shall have been paid in full for all such work, and shall have been paid wages therefor at rates not less than those that may be determined by the Secretary [of Agriculture] to be fair and reasonable after investigation and due notice and opportunity for public hearing . . .

**3.** 40 F.R. 27050 (June 26, 1975) states:

. . . I hereby propose to amend 20 CFR 602.10b(a)(1) as set forth below.

The "adverse effect" rates, which the proposed amendment would revise are the hourly minimum wage rates which an employer must offer to U.S. workers in order to be eligible to apply for a labor certification for the temporary use of foreign workers. Since the influx of temporary foreign labor has the effect of lowering prevailing wage rates, the Secretary has constructed these minimum wage rates for agriculture to reflect and rectify the adverse effect of the importation of alien workers. The rates are revised on an annual basis to reflect changing economic conditions in each State wherein a significant number of nonimmigrant alien workers are employed. Except for Florida sugarcane, the rates set forth herein were revised on the basis of the same formula which has been

With the expiration of the Sugar Act at the end of the 1974–75 crop year the Secretary had to determine a wage rate which would continue to avoid creating an adverse effect on American workers. As his base for computation, the Secretary used the legal wage rate from 1974 ("the prevailing rate" of 20 C.F.R. § 602.10b(b)) which for that year was the Sugar Act rate, namely $2.45 hourly. The 1975 adverse effect rate calculated from this base, $2.84, was reached through adjusting that base by the percentage change in the USDA hourly farm wage for Florida, of 16%. This method of computation of the 1975 adverse effect wage rate and the circumstances behind it were stated by the Secretary in the Federal Register.[3]

The League objects that the use of the 1974 Sugar Act rate by the Secretary as a base for 1975 calculations clearly exceeded his statutory authority because the Act had expired.

used since 1968. The prior year's rate was adjusted by the percentage change in the United States Department of Agriculture hourly farm wage rate (without room or board).

This year no adverse effect rate is being published for the State of Rhode Island because it has been determined that the number of alien workers imported into that State is not sufficient to adversely effect the wages of domestic workers. Conversely, the adverse effect rate is being published for the State of Maryland because it is believed that the importation of alien workers could impact upon the wages otherwise payable to domestic workers. An adverse effect rate is also being published for the State of Florida for sugarcane only. This addition is necessitated by the expiration of the Sugar Act under which the Department of Agriculture determined minimum wage rates, among other things, for sugarcane harvesting. Since sugarcane is the only crop in Florida for which the importation of alien workers would adversely effect the wages that would otherwise be paid to domestic workers, it is the only crop rate determined. The 1975 proposed rate for Florida sugarcane was determined by adjusting the U. S. Department of Agriculture 1975–75 rate for Florida sugarcane cutting, by the percentage change in the USDA hourly rate for the State of Florida.

■ We find however that the Secretary's adoption of the $2.84 rate was proper, and that the League's objections to the Secretary's determination are unfounded. We, of course, are bound by the distinction that "[w]hen promulgating a rule, an agency is not required to abide by the same stringent requirements of fact findings and supporting reasons which apply to adjudication." *Mobil Oil Corporation v. Federal Power Commission,* D.C.Cir. 1972, 152 U.S. App.D.C. 119, 469 F.2d 130, 139, *cert. denied,* 1973, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159. Here we review rule-making proceedings, rather than agency adjudication. This is clear from the Administrative Procedure Act's definition of "rule" as including "the approval or prescription for the future of rates, wages . . . ." 5 U.S.C.A. § 551(4). The League's argument must be measured against the standard of review appropriate to this type of administrative proceeding:

It is clear that the findings required of an agency in its rule-making capacity are of a different nature from those required in adjudication (5 U.S.C. Secs. 556 and 557). [citations omitted] The relevant standard for rule-making is that "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." (5 U.S.C. Sec. 553). In arriving at a policy determination under this procedure the Commission is not bound by the record, but may look beyond it and draw upon its own expertise and experience. [citations omitted]

*General Telephone Co. of Southwest v. United States,* 5 Cir. 1971, 449 F.2d 846, 862.

■ It seems clear that the Secretary has satisfied the requirement of 5 U.S.C.A. § 553 of adopting "a concise general statement" of the basis for his wage determination. His statement proposing the $2.84 rate, provides an adequate explanation of the rationale behind his determination.

Moreover to whatever partial extent the Secretary's reasons for calculating the rate in the way he did are implicit rather than explicit, the courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 1974, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456.

The district court correctly concluded that the Secretary had implicitly found that the 1974 Sugar Act rate (utilized as *the* legal minimum wage for Florida sugar workers for that year) had an economic impact upon all Florida agricultural wages. That wage rate affected approximately 8500 foreign workers annually. This substantial economic impact provided a relevant reason for basing the 1975 rate thereon.

■ Finally, having concluded that substantial reasons for the Secretary's calculation of the 1975 adverse effect wage rate were given, thus enabling effective judicial review, we turn to the question of whether those reasons were proper for him to have considered. The League argues that the Secretary was not statutorily authorized to consider the impact of the Sugar Act rate. The League points out that the "fair and reasonable" wage determined by the Secretary of Agriculture and used in the Sugar Act is based upon a consideration of factors which the Secretary of Labor is not authorized to consider.[4] The gist of this argument is that the Secretary of Labor's use of the 1974 Sugar Act rate as a base in 1975, after the expiration of that Act, overreached his statutory authority into the realm of purely arbitrary value judgments.

But, this argument ignores not only economic reality, but also the thrust of the entire statutory-regulatory framework conferring extensive discretionary authority upon the Secretary of Labor. Essentially there is no substantive law for the Secre-

---

4. The standards considered by the Secretary of Agriculture in determining "[the fair and reasonable wage] are the cost of living, the current prices for sugar and its by-products, anticipated income from the production of sugarcane, and the cost of production." *Freeman v. United States Department of Agriculture,* D.D.C. 1972, 350 F.Supp. 457, 459; 39 F.R. 36849 (Oct. 15, 1974).

tary to apply in executing the certification process. The district court correctly held that the Secretary might have utilized any of a number of reasonable formulas to prevent the employment of seasonal foreign workers from having an adverse effect upon domestic workers. The immigration statute does not specify the particular way in which avoidance of this adverse effect must be determined. In cases challenging an administrator's regulatory interpretation of an empowering statute, the courts have always used the "reasonably related" standard of review. *Mourning v. Family Publications Service, Inc.,* 1973, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660–61, 36 L.Ed.2d 318, 329–30. The Supreme Court explained the practical result of application of this standard of review:

> We have consistently held that where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority.

*Id.* at 371–72, 93 S.Ct. at 1662, 36 L.Ed.2d at 331.

In the approach taken by the League, the Secretary would be forced to close his eyes to the current economic conditions resulting from the wage rate that had been paid to 8,500 workers in Florida last year. It does not follow that because the Secretary can no longer use the statute to set a Sugar Act rate, he should likewise be deprived of considering its *present* impact which continues to affect the rate of wages paid Florida sugar cane workers. The statutory caveat in 8 U.S.C.A. § 1101(a)(15)(H)(ii) defining those nonimmigrant aliens allowed "to perform temporary services or labor" in America contains the all-important proviso "*if* unemployed persons capable of performing such service or *labor cannot be found in this country*" (emphasis added). The League's theory stresses its economic hardship in having to pay an adverse effect wage rate computed with a base rate derived from the Sugar Act, but without receiving the benefit of that Act's subsidies. But that sort of concern

> collides with the mandate of a Congressional policy. To recognize a legal right to use alien workers upon a showing of business justification would be to negate the policy which permeates the immigration statutes, that domestic workers rather than aliens be employed wherever possible.

*Elton Orchards, supra,* 508 F.2d at 500.

We find that the determination of the $2.84 adverse effect wage rate for 1975 by the Secretary of Labor was a proper exercise of his rule-making authority "reasonably related to the purposes of the enabling legislation". *Thorpe v. Housing Authority,* 1969, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474, 483. Moreover, as this Court has explained:

> When, as here, that interpretation obviously incorporates quasi-technical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme, judges should be particularly reluctant to substitute their personal assessment of the meaning of a regulation for the considered judgment of the agency. If the agency interpretation is merely one of several reasonable alternatives, it must stand even though it may not appear as reasonable as some other. [footnotes omitted]

*Allen M. Campbell Co. Gen. Con., Inc. v. Lloyd Wood Const. Co.,* 5 Cir. 1971, 446 F.2d 261, 265.

AFFIRMED.