531 F.2d 305
 Andrew WILLIAMS, Individually and on behalf of all others
similarly situated, Plaintiffs-Appellants,
v.
W. J. USERY, in his capacity as Secretary of Labor, United
States Departmentof Labor, et al., Defendants-Appellees.
 No. 75--3458.
 United States Court of Appeals,
Fifth Circuit.
 May 10, 1976.
Rehearing and Rehearing En Banc
Denied June 8, 1976.
 
 Bill Abbuehl, Belle Glade, Fla., Michael Masinter, Florida Rural Legal Services, Inc., Homestead, Fla., Katherine Gruenheck, Migrant Legal Action Program, Washington, D.C., for plaintiffs-appellants.
 Steven M. Guttell, Atty., U.S. Dept. of Labor, Washington, D.C., with whom William J. Kilberg, Sol. of Labor, Craig A. Berrington, Associate Sol., Carl W. Gerig, Jr., Counsel for Manpower Litigation, Washington, D.C., Beverley R. Worrell, Regional Sol., U.S. Dept. of Labor, Atlanta, Ga., and Rex L. Young, U.S. Dept. of Justice, Washington, D.C., were on brief for defendants-appellees.
 Charles Kelso, Atlanta, Ga., for Fla. Sugar Cane League.
 Appeal from the United States District Court for the Southern District of Florida.
 Before DYER and CLARK, Circuit Judges, and KRAFT*, District Judge.
 DYER, Circuit Judge:
 
 
 1
 This appeal, like the companion case of Florida Sugar Cane League v. Usery, 5 Cir. 1976, 531 F.2d 299, decided today, raises a number of objections to the Secretary of Labor's basis for the determination of the 'adverse effect wage rate' for sugar cane cutters in Florida. Williams, an American unemployed sugar cane cutter, argued unsuccessfully in the district court that the Secretary had set the rate too low. He contended that the Secretary had failed to follow certain mandatory procedures in the certification of no adverse effect upon domestic workers from the use of foreign workers. Within the same contours of review of administrative rule-making enumerated this day in League, supra, we find no error in the district court's denial of injunctive relief.
 
 
 2
 Like the Florida Sugar Cane League, Williams attacks the Secretary's method of computations in arriving at the $2.84 'adverse effect wage rate'. Unlike the argument of the League that the Secretary had exceeded his authority by considering extrinsic criteria, Williams asserts the Secretary failed to exercise the authority imposed upon him to avoid adverse effects on the wages of American workers. He objects to the 'adverse effect wage rate' itself ($2.84) as too low to attract domestic workers. Although Williams raised this issue in this case below, he did not raise it on appeal in the case sub judice. Instead, Williams raised it in his Amicus Curiae brief in League supra. Since the issue fits more logically within the confines of this opinion, we decide it here. Williams seeks to require the Secretary to: 1) determine 'the prevailing wage rate' for sugar cane in Florida; 2) require growers utilizing a piece rate system to guarantee average hourly earnings 25 percent higher than the hourly rate otherwise required; and 3) establish a 30 day period of recruitment of domestic sugar cane cutters at the designated 'adverse effect wage rate,' prior to issuance of the certification for foreign labor.
 
 
 3
 In our view these arguments are based on a misunderstanding of the nature of the regulatory scheme authorized under the Immigration and Nationality Act, 8 U.S.C.A. § 1101 et seq. Even if desirable, the Secretary has no authority to set a wage rate on the basis of attractiveness to workers. His authority is limited to making an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers. As we said in League, supra, 531 F.2d at 301, '(n) either the statute nor the regulations establish a formula for the Secretary's computation of this 'adverse effect wage rate'.' We there upheld the Secretary's computation arriving at the $2.84 adverse effect rate as a reasonable method of avoiding wage deflation.
 
 
 4
 Williams' notion of a wage rate, high enough to attract those domestic workers not otherwise willing to work in sugar cane, jumps well beyond the discretionary authority of the Secretary. Clearly, his authority to insure against a lowering of wages is hardly synonomous with the affirmative power to raise wages which Williams here proposes. 'Attractiveness' is the wrong test for measuring the Secretary's determination.[1] We agree with the district court that the regulations and procedures used by the Secretary, in the absence of specific statutory standards, appear reasonably suited to achieve the statutory purpose of guarding against a general wage deflation from the employment of foreign workers. Within this latitude of discretion, we can find no legal basis for imposing an obligation on the Secretary to set an 'attractive' wage.
 
 
 5
 The Secretary's regulations required that the 'prevailing rate for a crop activity in an area' be paid when it is higher than the 'adverse effect wage rate': 20 C.F.R. § 602.10b(b). Williams contends that the Secretary must necessarily determine the 'prevailing wage rate' in order to know when it is higher than the 'adverse effect wage rate'. The Secretary claims that it is impossible to determine a 'prevailing wage rate' for sugar cane in Florida. Williams' argument relies on figures showing sugar cane cutters' actual 'average earnings', rather than a 'prevailing wage rate'. The term 'prevailing wage rate' has a specific meaning, defined by the Secretary and stipulated to by Williams, namely, 'the wages paid, to domestic agricultural workers' (emphasis added). The fact is, as conceded by Williams, that '100 percent (or nearly 100 percent)' of Florida sugar cane cutters are foreign workers. Thus it would seem obvious that the Secretary was correct in contending there is no way to determine a 'prevailing wage rate' in Florida sugar cane.
 
 
 6
 Moreover, this particular 'crop activity' uses a wage rate system incapable of yielding a 'prevailing wage rate'. In sugar cane there is no standard unit of production. Sugar cane piece rates are based on the row of cane cut, but each row varies in cuttage and other factors affecting difficulty in cutting. There is simply no evidentiary basis for requiring a survey to determine that rate. Williams has merely offered figures establishing the average earnings of Florida agricultural laborers in general. Such non-crop specific data clearly cannot substitute for 'the prevailing rate for a crop activity'. The district court correctly held that Williams failed to prove any duty by the Secretary to determine this rate under these circumstances.
 
 
 7
 Williams' argument that 20 C.F.R. § 602.10b(e) of the regulations[2] requires the Secretary to increase the adverse effect wage rate by 25% suffers from a similar failure of proof. This regulation is permissive; it allows a particular pay system, namely a piece rate wage, at the option of the employer. The regulation's 25% increase applies only upon the affirmative act of the employer. This provision clearly does not apply in every instance of payment by a piece rate rather than by an hourly rate.
 
 
 8
 Nowhere is there a requirement that piece rates be in excess of the adverse effect minimum wage. Rather, the regulations state that these piece rates be designed to produce the equivalent of the adverse effect wage rate: 20 C.F.R. § 602-10b(a)(2) guarantees that whatever the piece rate wage, it shall in no event amount to less than the wage at the hourly rate.[3] This latter provision provides complete protection against Williams' expressed fear that growers would use the piece rate as a subterfuge to defeat the guaranteed hourly earnings requirement. The usual piece rate wage under § 602.10b(a)(2) and the special 25% increased piece rate wage under § 602-10b(e) are not interchangeable. The significant difference of (e) from (a)(2) is that (e) does not contain (a)(2)'s requirement that each individual worker receive at least the minimum wage of the 'adverse effect wage rate.' In the (e) piece rate system, it is the overall average earnings of the employees involved which is guaranteed to be 25% higher than the hourly rate. The individual worker is not guaranteed that his own wage will be 25% higher unless he cuts a sufficient number of pieces of sugar cane. This is his 'incentive' to cut as much as he can as fast as he can.
 
 
 9
 Furthermore, the district court correctly found that Williams failed to show evidence of any employer seeking to use this special pay system. In fact the parties stipulated that the Secretary had 'not received any employer request under the provisions of 20 C.F.R. § 602.10b(e).' The district court properly refused to apply the (e) provisions to the sugar cane cutters.
 
 
 10
 Finally, Williams would have us invalidate the Secretary's determinations because he did not wait thirty days to allow interstate recruitment of domestic laborers prior to acting upon the request for certification of the need for foreign laborers. Williams argues that this delay is required by the regulation, 20 C.F.R. § 602.10(b).[4] But this misreads the regulation. The requirement applies to the employer rather than the Secretary. The Secretary may require the employer to file his request in advance of the date of need for his specific job, so as to facilitate the Secretary's initial task of determining the availability of domestic workers. The time may well be needed to find out this information, when the Secretary has had no prior knowledge of the particular industry.
 
 
 11
 There is no reason for such delay here, nor do the regulations even suggest that such a delay is mandatory when the Secretary has had past experience in the particular industry. Here the Secretary certainly had knowledge of the availability and nonavailability of domestic laborers from his experience with the Florida sugar cane industry.
 
 
 12
 We note that domestic laborers will in no way be deprived of their right to work by this certification procedure. Even after certification of the need for foreign laborers is granted, job offers must still be kept open for domestic laborers. If additional domestic laborers can be recruited by use of the clearance system, even after foreign laborers have arrived in the country, all such domestic workers will be given employment preference. 20 C.F.R. § 602.10(d)(2).
 
 
 13
 AFFIRMED.
 
 
 
 *
 Senior District Judge of the Eastern District of Pennsylvania sitting by designation
 
 
 [1]
 By contrast, consider the Secretary of Agriculture's responsibility under the now defunct Sugar Act for determining 'fair and reasonable wage rates.' This distinct statutory standard was the responsibility of a different department under a different Act. See Angel v. Butz, 10 Cir. 1973, 487 F.2d 260, 262, for an explanation of that responsibility
 
 
 [2]
 20 C.F.R. § 602.10b(e) provides:
 (e) Upon application to, and approval by, the Secretary of Labor in each case, an agricultural employer may use piece rates which are designed to, and do, produce earnings by his employees engaged in the type of work covered by the job offer or contract, the average of which for the weekly or biweekly period is 25 percent higher than the hourly rates applicable under paragraph (a) of this section for agricultural workers. Should the average of the hourly earnings of such employees fall below this requirement, each worker's earnings for each payroll period within such weekly or biweekly period must be increased by the percentage needed to bring the total average to this requirement.
 
 
 [3]
 20 C.F.R. § 602.10b(a)(2) provides:
 (2) Piece rates shall be designed to produce hourly earnings at least equivalent to the hourly rate specified in subparagraph (1) of this paragraph for the State in which the work is to be performed and no workers shall be paid less than the specified hourly rate.
 
 
 [4]
 20 C.F.R. § 602.10(b) provided in relevant part:
 . . . Such offers of employment, as well as any request for certification for temporary foreign workers, should be filed at the local office in sufficient time to allow the Manpower Administration 30 days to determine the availability of domestic workers, in addition to the time necessary for the employer to secure foreign workers by the date of need if the certification is approved.