Almeda FARMER; Jacqueline Wilson; Billy Pizano; Maleka Hortelano; Santiago Arbalaez; Claudia Hernandez, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA; Carolina Employers' Association, Incorporated; North Carolina Growers Association, Incorporated; Dennis Coe, Defendants–Appellees.

No. 92–1941.

United States Court of Appeals, Fourth Circuit.

Argued March 29, 1993.

Decided Sept. 2, 1993.

---

Pamela Rose DiStefano, Farmworkers Legal Services of North Carolina, Raleigh, NC, argued (Donnell Van Noppen, III, Patterson, Harkavy, Lawrence, Van Noppen & Okun, on brief), for plaintiffs-appellants.

Ann Margaret Pointer, Fisher & Phillips, Atlanta, GA, argued (Charles Kelso, David Kresser, Fisher & Phillips, Atlanta, GA, Thomas S. Whitaker, James A. Haney, and Thelma M. Hill, Employment Sec. Comm'n of North Carolina, Raleigh, NC, on brief), for defendants-appellees.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, ERVIN, Chief Judge, and HAMILTON, Circuit Judge.

### OPINION

ERVIN, Chief Judge:

Santiago Arbalaez, Almeda Farmer, Claudia Hernandez, Maleka Hortelano, Billy Pizano, and Jacqueline Wilson, temporary farmworkers, brought this action against Carolina Employers' Association, Inc. ("CEA"), North Carolina Growers Association, Inc. ("NCGA"), and the Employment Security Commission of North Carolina, seeking declaratory and injunctive relief on behalf of a class composed of all women and families accompanied by minor children who seek or are discouraged from seeking employment with housing. The workers' complaint alleged, *inter alia*, that the defendants had discriminated against them on the basis of familial status in the provision of housing as a component of employment, in violation of the 1988 amendments to the Fair Housing Act of 1968, 42 U.S.C. § 3604. The defendants answered that the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1188(c)(4), which requires agricultural employers to provide family housing to foreign workers only where such is the prevailing practice in the relevant area or occupation, exclusively defines their responsibilities with respect to the provision of free housing.

We must decide whether the prohibition against familial-status housing discrimination in 42 U.S.C. § 3604 governs 8 U.S.C. § 1188(c)(4) as the controlling expression of agricultural employers' duty to provide family housing to temporary workers. We hold that it does not.

## I

This appeal asks us to resolve an apparent conflict between two statutes. We describe the relevant background in three parts. First, we review the federal statutory and regulatory scheme *governing the employment* of temporary agricultural workers. Second, we recount the injuries allegedly suffered by the plaintiffs. Finally, we examine the procedural history of the instant action before the district court.

### A

Each year North Carolina farmers employ thousands of temporary farmworkers for the purpose of cultivating and harvesting labor-intensive crops.[1] The farmers are permitted to hire foreign temporary laborers through the federal government's "H–2A" program. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Under this program, agricultural employers who anticipate a shortage of domestic farm labor may bring foreign workers into the United States if they obtain from the Secretary of Labor a certification (1) that there are not enough domestic workers able, willing, and qualified to perform the necessary work; and (2) that the employment of foreign workers will not adversely affect the wages and working conditions of similarly employed domestic workers. *Id.* § 1188(a)(1)(A) & (B). As part of the certification process, prospective H–2A employers must submit a "job order" through the Employment Service System, a nationwide federal job referral service functioning through cooperating state agencies, to attempt to attract domestic workers to their jobs. *See* 20 C.F.R. § 655.101(c). The

Employment Security Commission is the Employment Service System's North Carolina affiliate.

According to federal law, H–2A employers must make certain benefits[2] available to all temporary agricultural laborers. Among these benefits is housing. The statute governing the admission of temporary H–2A foreign workers into the United States provides in pertinent part that

> [e]mployers shall furnish housing in accordance with regulations. The employer shall be permitted at the employer's option to provide housing meeting applicable Federal standards for temporary labor camps or to secure housing which meets the local standards for rental and/or public accommodations or other substantially similar class of habitation: ... *Provided* ..., That when it is the prevailing practice in the area and occupation of intended employment to provide family housing, family housing shall be provided to workers with families who request it. ...

8 U.S.C. § 1188(c)(4).

Pursuant to the opening sentence of this provision, the Secretary of Labor has promulgated extensive implementing regulations governing housing as a required benefit for temporary agricultural laborers. Whereas 8 U.S.C. § 1188(c)(4) requires agricultural employers to provide housing only to foreign workers present in the United States through the H–2A program, the Secretary's regulations extend H–2A employers' housing responsibilities to "United States workers"[3]

---

1. Affidavits submitted to the district court by the North Carolina Employment Security Commission indicate that more than 33,000 temporary farmworkers labored in the fields of North Carolina during the 1991 growing season. Some twenty-nine percent of the state's whole agricultural workforce at any given time is female, and thirty-eight percent consists of adults accompanied by minor children.

2. These benefits include, *inter alia,* (1) workers' compensation coverage, 20 C.F.R. § 655.-102(b)(2); (2) three meals per day where the employer provides only centralized cooking and eating facilities, *id.* § 655.102(b)(4); (3) transportation to and from the place of employment when it is the prevailing practice of non–H–2A agricul-

tural employers in the same area and occupation to transport workers, *id.* § 655.102(b)(5); and (4) if the worker will be paid by the hour, the highest wage rate from a group of rates consisting of the prevailing hourly wage rate in the area, the legal federal minimum wage rate, or the legal state minimum wage rate, *id.* § 655.102(b)(9).

3. A "United States worker" is defined as

> any worker who, whether a U.S. national, a U.S. citizen, or an alien, is legally permitted to work in the job opportunity within the United States (as defined at § 101(a)(38) of the I[mmigration] [and] N[ationality] A[ct] (8 U.S.C. § 1101(a)(38)).

20 C.F.R. § 655.100(b).

as well. *See* 20 C.F.R. § 655.102(a).[4] Thus, agricultural employers must provide housing both to foreign H–2A laborers and to domestic temporary workers

> who are not reasonably able to return to their residence within the same day ..., without charge to the worker, which may be, at the employer's option, rental or public accommodation type housing.

*Id.* § 655.102(b)(1). The regulations further state that employers must provide *family* housing upon request to foreign and domestic temporary workers with families "[w]hen it is the prevailing practice in the area of intended employment and the occupation to provide family housing." *Id.* § 655.102(b)(1)(vi).

### B

The facts of the instant case are not in dispute. The plaintiffs are all "United States workers"[5] within the meaning of 20 C.F.R. § 655.100(b) who sought agricultural employment with provision for housing in family units. Housing information provided by participating H–2A farmers to the United States Department of Labor indicates that the vast majority of housing North Carolina farmers provide to temporary farmworkers consists of small frame houses, mobile homes, and converted tobacco barns. Some temporary labor camps supply housing built of cinder blocks and configured like a motel, with two rows of rooms entered from the outside and common, non-sleeping areas. In these structures, couples and family members typically are housed in separate rooms, and single women are housed in separate rooms from single men. As the experiences of the individual plaintiffs show, North Carolina farmers usually offer free housing only to workers. The farmers generally do not offer free housing to non-working family members,

whether these persons are spouses, children, or anyone else connected with a worker by family tie. When the plaintiffs applied for jobs as agricultural laborers with the defendants, they were told that free housing would be provided only for workers. The plaintiffs do not dispute that family housing is not the "prevailing practice" for temporary agricultural jobs in North Carolina within the meaning of 8 U.S.C. § 1188(c)(4).

Billy Pizano, for example, alleged that he contacted four North Carolina farmers employing H–2A workers to obtain an agricultural job with family housing for his common-law wife and their eighteen month-old child. With each contact he was turned away. When Pizano went to the local office of the North Carolina Employment Security Commission to complain, a representative informed him that the housing provided pursuant to the H–2A program was not for women and families, and that he and his family would not be given family housing.

Similarly, Jacqueline Wilson contended that she and her husband went to a local North Carolina Employment Security Commission office to inquire about temporary agricultural jobs that would provide free housing. The Commission's representative examined the job orders submitted by farmers employing H–2A laborers and informed Wilson that all of the available jobs had "single-sex" or "barracks-type" accommodations with no sleeping or bath facilities for women. The representative offered Wilson's husband a job, but could not refer her to any of the available H–2A jobs because she would not agree to share sleeping and bath facilities with male workers other than her husband.

Finally, Santiago Arbalaez, Almeda Farmer, Claudia Hernandez, and Maleka Hortelano inquired about or applied for agricultural employment and housing with one or more of

---

**4.** 20 C.F.R. § 655.102(a), titled "Preferential treatment of aliens prohibited," provides that

> [t]he employer's job offer to U.S. workers shall offer the U.S. workers the same benefits, wages, and working conditions which the employer is offering, intends to offer, or will provide to H–2A workers.

*Id.* 20 C.F.R. § 655.102(b), which describes the "[m]inimum benefits, wages, and working conditions" referred to in subsection (a), contains the

Secretary of Labor's regulations with respect to the provision of housing as a benefit of temporary agricultural employment. *See id.* § 655.-102(b)(1) (titled "Housing"). Thus, the Secretary's regulatory scheme plainly contemplates housing as one of the benefits to which American temporary agricultural workers are entitled in the same degree as foreign H–2A laborers.

**5.** *See supra* note 3.

the defendants in 1990 or 1991. They contended that they were refused job referrals by the Employment Security Commission, and were discouraged by the Commission from seeking work with agricultural employers due to their gender and familial status. In affidavits submitted together with the complaint herein, Farmer, Hortelano, Arbalaez, and Hernandez explained that the defendants had advertised, offered, and referred applicants to jobs providing housing described by the defendants as "single-sex, shared unit" housing. Farmer, Hortelano, Arbalaez, and Hernandez alleged that the defendants failed to refer, refused to hire, or otherwise discouraged them from applying for these jobs, thereby discriminating against them in the provision of employment and housing on the basis of gender and familial status.

### C

On October 29, 1991, the plaintiffs filed the instant action, requesting declaratory and injunctive relief on behalf of a class composed of women and families accompanied by minor children who seek or are discouraged from seeking temporary agricultural employment with housing.[6] In addition, Jacqueline Wilson prayed for declaratory and injunctive relief on behalf of a sub-class comprised of all women who seek or are discouraged from seeking seasonal agricultural employment with housing through the Employment Security Commission. The plaintiffs' complaint contained two claims. First, the complaint alleged that the defendants had discriminated against them in violation of the 1988 amendments to the Fair Housing Act, 42 U.S.C. § 3604, in that the H–2A employers whom the defendants represent offered free housing only to workers and not to workers' nonworking family members. The plaintiffs therefore urged the district court to enjoin the defendants from accepting job orders that did not provide free housing for temporary laborers' nonworking family members. Second, the sub-class plaintiffs claimed that in discouraging them from seeking H–2A agricultural jobs with free housing, the Employment Security Commission had discriminated against them on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 to 17.[7]

After answering the complaint, the defendants moved the district court to stay discovery, asserting that they soon would file dismissal motions which would dispose of the case on legal grounds. The court granted the motion to stay. The defendants then filed, together with supporting affidavits, a motion to dismiss the entire complaint, which the court treated as a motion for summary judgment.[8] See Fed.R.Civ.P. 12(b); 56. On June 1, 1992, the district court granted summary judgment in favor of the defendants with respect to the plaintiffs' Fair Housing Act claim, holding (1) that the family housing provision of the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1188(c)(4), could not be harmonized with the familial-status discrimination provisions of the 1988 amendments to the Fair Housing Act, 42 U.S.C. § 3604; (2) that the requirements of 8 U.S.C. § 1188(c)(4) govern over those of 42 U.S.C. § 3604 where H–2A employers are concerned; and (3) that the regulations promulgated pursuant to 8 U.S.C. § 1188(c)(4) require participating H–2A employers to provide family housing only where such is the prevailing practice in the area of intended employment and in the occupation. See 20 C.F.R. § 655.102(b)(1)(vi). The court then

---

**6.** Defendants CEA and NCGA are associations of agricultural employers. CEA and NCGA import temporary Mexican laborers under the H–2A program.

**7.** In addition, the sub-class's gender discrimination claim was premised on Department of Labor regulations forbidding Employment Service System affiliates such as the North Carolina Employment Security Commission from accepting any job order containing any "unlawful discriminatory specification by ... sex." 20 C.F.R. § 653.501(d)(1), (e)(1).

**8.** Where a defendant moves to dismiss the plaintiff's complaint for failure to state a claim upon which relief may be granted, see Fed.R.Civ.P. 12(b)(6), and presents matters outside the pleadings that are not excluded by the court, the dismissal motion must be treated as one for summary judgment and disposed of as provided in Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b).

denied summary judgment with respect to the sub-class plaintiffs' Title VII gender discrimination claim, holding (1) that all members of the sub-class had exhausted their administrative remedies; and (2) that the sub-class plaintiffs were entitled to proceed with discovery on their claim.

On July 1, 1992, upon joint motion by the parties, the district court amended its summary judgment order to certify its ruling on the plaintiffs' 42 U.S.C. § 3604 discrimination claim for immediate interlocutory appeal. The court was of the view that the ruling involved a controlling question of law as to which there was substantial ground for difference of opinion, and that an immediate appeal would materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b). On August 14, 1992, we entered an order granting the plaintiffs' petition for an interlocutory appeal with respect to the district court's determination on their Fair Housing Act claim. The issue has been fully briefed and argued, and is now ripe for decision.

## II

■ As certified by the district court, the sole question before us is

whether the provision in the Fair Housing Amendments Act of 1988 prohibiting family [sic] status discrimination controls over the provision in the Immigration Reform and Control Act of 1986[,] which requires family housing only when it is the prevailing practice in the area and occupation of intended employment.

*Farmer v. Employment Sec. Comm'n,* No. 91–720–CIV–5–BR, slip op. at 1–2 (E.D.N.C. July 1, 1992) (order granting parties' joint motion to certify ruling for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b)). The district court granted summary judgment against the plaintiffs' Fair Housing Act claim as a matter of law. In reviewing the ruling below, our responsibility is to determine whether an error of law was committed. We do so by considering the question presented *de novo. See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 508 & n. 27, 104 S.Ct. 1949, 1959, 1963 & n. 27, 80 L.Ed.2d 502 (1984).

"The task of resolving a dispute over the meaning of ... statute[s] begins where all such inquiries must begin: with the plain language of the statute[s] [them]sel[ves]." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (citations omitted). Accordingly, we devote the following paragraphs to an examination of the provisions of the Immigration Reform and Control Act of 1986 and the 1988 Fair Housing Act amendments at issue in this case. We then consider whether the statutes are in conflict.

### A

We quoted the subsection of the Immigration Reform and Control Act of 1986 at issue in this case, 8 U.S.C. § 1188(c)(4), by way of background in part I.A *supra.* We now review this provision in detail. It states:

Employers shall furnish housing in accordance with regulations. The employer shall be permitted at the employer's option to provide housing meeting applicable Federal standards for temporary labor camps or to secure housing which meets the local standards for rental and/or public accommodations or other substantially similar class of habitation: *Provided,* That in the absence of applicable local standards, State standards for rental and/or public accommodations or other substantially similar class of habitation shall be met: *Provided further,* That in the absence of applicable local or State standards, Federal temporary labor camp standards shall apply: *Provided further,* That the Secretary of Labor shall issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock: *Provided further,* That when it is the prevailing practice in the area and occupation of intended employment to provide family housing, family housing shall be provided to workers with families who request it: *And provided further,* That nothing in this paragraph shall require an employer to provide or secure housing for workers who are not entitled to it under the temporary

labor certification regulations in effect on June 1, 1986.

*Id.* Close inspection of the plain language of the statute reveals several principles directly relevant to resolution of this case.

8 U.S.C. § 1188(c)(4) is a subsection of 8 U.S.C. § 1188, which is titled "Admission of temporary H–2A workers." As its heading indicates, the provisions of section 1188 apply to foreign workers brought into the United States as temporary agricultural laborers pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a).[9] Thus, the housing provisions of section 1188(c)(4) by their terms govern only those farmers who employ temporary labor pursuant to the H–2A program.

The first sentence of subsection 1188(c)(4), however, requires H–2A employers to "furnish housing in accordance with regulations." This requirement incorporates by reference any housing regulations promulgated pursuant to subsection 1188(c)(4) among H–2A employers' statutory duties with respect to the provision of free housing. As we noted in part I.A *supra*,[10] the Secretary of Labor has promulgated a number of such regulations. Among them is the requirement that H–2A employers offer domestic workers "the same benefits ... and working conditions which the employer is offering, intends to offer, or will provide to H–2A workers." 20 C.F.R. § 655.102(a). By operation of 20 C.F.R. § 655.102(a), H–2A employers must provide

housing both to foreign laborers and to temporary domestic workers

> who are not reasonably able to return to their residence within the same day ..., without charge to the worker, which may be, at the employer's option, rental or public accommodation type housing.

*Id.* § 655.102(b)(1). These regulations effectively ensure that U.S. workers are enabled to accept temporary agricultural jobs with the assurance that they will be afforded free housing at least to the same degree as foreign H–2A laborers.[11]

The fourth limiting clause of subsection 1188(c)(4) also makes clear that "family housing" will be provided to H–2A laborers only (1) upon request by the laborer; and (2) "when it is the prevailing practice in the area and occupation of intended employment." 8 U.S.C. § 1188(c)(4). The Secretary of Labor's regulations promulgated under subsection 1188(c)(4) echo this requirement in virtually identical language. *See* 20 C.F.R. § 655.102(b)(1)(vi).[12] Thus, H–2A employers need only provide family housing to foreign laborers under subsection 1188(c)(4) if the worker requests such housing and if family housing is the prevailing practice in the area and occupation of intended employment.

Finally, the fifth limiting clause of subsection 1188(c)(4) states:

> [N]othing in this paragraph shall require an employer to provide or secure housing

**9.** *Cf.* 8 U.S.C. § 1188(i)(2) (defining the term "H–2A worker" as "a nonimmigrant described in section 1101(a)(15)(H)(ii)(a) of this title"); 20 C.F.R. § 655.100(b) (defining "H–2A worker" as "any nonimmigrant alien admitted to the United States for agricultural labor or services of a temporary or seasonal nature under section 101(a)(15)(H)(ii)(a) of the I[mmigration] [and] N[ationality] A[ct] (8 U.S.C. [§] 1101(a)(15)(H)(ii)(a))").

**10.** *See supra* note 4 and accompanying text.

**11.** 20 C.F.R. § 655.90 contains, *inter alia,* a general provision relating to the proper judicial construction of the Secretary of Labor's regulations codified at 20 C.F.R. § 655.100–.115:

> *Construction.* This subpart shall be construed to effectuate the purpose of the I[mmigration] [and] N[aturalization] A[ct] that U.S. workers rather than aliens be employed wherever possible. *Elton Orchards, Inc. v. Brennan,*

508 F.2d 493, 500 (1st Cir.1974); *Flecha v. Quiros,* 567 F.2d 1154, 1156 (1st Cir.1977), [*cert. denied sub nom. Flecha v. Marshall,* 436 U.S. 945, 98 S.Ct. 2846, 56 L.Ed.2d 786 (1978)]. Where temporary alien workers are admitted, the terms and conditions of their employment must not result in a lowering of the wages, terms, and conditions of domestic workers similarly employed. *Williams v. Usery,* 531 F.2d 305, 306 (5th Cir. []), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 [(1976)], and the job benefits extended to any U.S. workers shall be at least those extended to the alien workers. *Id.* § 655.90(d).

**12.** 20 C.F.R. § 655.102(b)(1)(vi) provides:

> *Family housing.* When it is the prevailing practice in the area of intended employment and the occupation to provide family housing, family housing shall be provided to workers with families who request it.

for workers who are not entitled to it under the temporary labor certification regulations in effect on June 1, 1986.

The "temporary labor certification regulations" this statement incorporates are those found·at 20 C.F.R. § 655.201–.215.[13] These regulations, like those at 20 C.F.R. § 655.-102(a) & (b), demand that an H–2A employer's job offer to·a domestic worker afford the worker at least the same benefits and working conditions, including housing, that the employer is offering to H–2A workers. *See* 20 C.F.R. § 655.202(a) & (b).[14] Because both U.S. workers and foreign H–2A labor were "entitled" to housing under this regulation, the fifth limiting clause of subsection 1188(c)(4) does not contribute to analysis of the issues before us.

Reading the statute and the regulations promulgated under it in tandem, we observe that 8 U.S.C. § 1188(c)(4) guarantees U.S. workers employed by participating H–2A farmers the benefit of free housing to the same degree as their foreign counterparts. Free housing must be provided to those U.S. workers who are not reasonably able to return to their residences within the same day. According to the plain language of the statute's fourth limiting clause, H–2A employers need provide *family* housing to U.S. workers only if the workers request such housing and if family housing is the prevailing practice in the area and occupation of intended employment.

**B**

We now examine the relevant portions of the 1988 amendments to the Fair Housing Act of 1968. For the first six years of its existence, the Fair Housing Act, originally enacted as Title VIII of the Civil Rights Act of 1968, Pub.L. No. 90–284, 82 Stat. 73 (1968), prohibited discrimination in the provision of housing on the basis of race, color, religion, or national origin. In 1974 the Act was amended to include'gender as an unlawful ground for discrimination[15] and, in 1988, the Act again was amended to prohibit discrimination on the basis of familial status or handicap.[16] The Act now makes it unlawful

(a).To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a. dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connec-

---

*Id.*

**13.** The regulations codified at 20 C.F.R. § 655.-90–.112, discussed *supra*, were promulgated on June 1, 1987. *See* 20 C.F.R. § 655, Subpart B. On June 1, 1986, the only existing regulations promulgated pursuant to 8 U.S.C. § 1188(c)(4)'s predecessor statute were codified at 20 C.F.R. § 655.200–.215. *See* 20 C.F.R. § 655, Subpart C.

**14.** 20 C.F.R. § 655.202(a) provides in pertinent part: .

So that the employment of aliens will not adversely affect the wages and working conditions of similarly employed U.S. workers, each employer's job offer to U.S. workers must offer U.S. workers at least the same benefits which the employer is offering, intends to offer, or will afford, to temporary foreign workers. Conversely, no job offer may impose on U.S. workers any restrictions or obligations which will not be imposed on the employer's foreign workers. For example, if the employer in tends to advance transportation costs to foreign workers either directly or indirectly (by having them paid by the foreign government

involved), the employer must offer to advance the transportation costs of U.S. workers.
*Id.* 20 C.F.R..§ 655.202(b) provides in pertinent part:

· Except when higher benefits, wages or working conditions are required by the provisions of paragraph (a) of this section, the Administrator has determined that, in order to protect similarly employed U.S. workers from adverse effect with respect to wages and working conditions, every job offer for U.S. workers must always include the following minimal benefit, wage, and working condition provisions:
(1) The employer will provide the worker with housing without charge to the worker.... When it is the prevailing practice in the area of intended employment to provide family housing, the employer will provide such housing to such workers.
*Id.* § 655.202(b)(1).

**15.** *See* Housing and Community Development Act of 1974, Pub.L. No. 93–383, 88 Stat. 633 (1974).

·**16.** *See* Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, 102 Stat. 1636 (1988) (codified at 42 U.S.C. § 3604(a)).

tion therewith, because of race, color, religion, sex, familial status, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to made any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. § 3604(a)-(d). "Familial status" is defined by the 1988 amendments as

one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) a parent or another person having legal custody of such individual or individuals; or

(2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).

The plaintiffs point to 42 U.S.C. § 3604(a) as forbidding H–2A employers "to make unavailable or deny" a dwelling to any person because of familial status. 42 U.S.C. § 3604(a).

### C

The plaintiffs readily admit that family housing is not the prevailing practice among North Carolina H–2A employers. They acknowledge that their quest for family housing is not covered by the plain language of 8 U.S.C. § 1188(c)(4) or its incorporated implementing regulations. The plaintiffs contend,

however, that the familial status discrimination provision of 42 U.S.C. § 3604(a) can, and should, be reconciled with the limited family housing obligations imposed upon H–2A employers pursuant to 8 U.S.C. § 1188(c)(4) to provide them desired family accommodations. In substance, their argument is that section 1188(c)(4) and its implementing regulations merely create a statutory floor for the housing benefits H–2A employers must provide to U.S. workers engaged in temporary agricultural jobs. Viewed in light of the plaintiffs' search for farm work where family housing is provided, that floor promises U.S. workers the same minimum access to family housing accorded foreign laborers. Yet the plaintiffs suggest that the existence of such a statutory floor does not imply the presence of a ceiling on the housing benefits they are owed. The plaintiffs therefore urge that 42 U.S.C. § 3604(a) be construed as imposing upon H–2A employers an additional duty not to deny U.S. workers accompanied by nonworking family members access to existing H–2A housing. Phrased differently, the plaintiffs maintain that 8 U.S.C. § 1188(c)(4) should be read in tandem with 42 U.S.C. § 3604(a) as requiring H–2A employers to afford U.S. workers access to free family housing even when family housing is not the prevailing practice in the area or occupation of intended employment.

Considered in the abstract, the plaintiffs' position has some merit. Neither the Immigration Reform and Control Act of 1986 nor the Fair Housing Amendments Act of 1988 offers any express hint of how each ought to be construed in relation to the other. No legislative history sheds light upon Congress's intentions in this respect. Moreover, the plaintiffs' position appears to fulfill, if not to exalt, the avowedly protectionist purposes of the Immigration Reform and Control Act's implementing regulations. *See, e.g.,* 20 C.F.R. § 655.102(b) (stating that the Department of Labor "has determined that in order to protect similarly employed U.S. workers from adverse effect with respect to benefits, wages, and working conditions[,]" every job offer made to a U.S. worker must contain the same minimum benefits as identical offers to a foreign H–2A worker). Finally, the plain-

tiffs' approach would enable us to satisfy our obligation of avoiding conflicts between overlapping statutory regimes. *See Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 492, 510, 109 S.Ct. 2584, 2587, 2596, 105 L.Ed.2d 415 (1989).

These attractions pale, however, before the plain language of 8 U.S.C. § 1188(c)(4). According to the statute, the only circumstance under which H–2A employers must provide family housing to temporary workers, whether foreign or domestic, is "when [family housing] is the prevailing practice in the area and occupation of intended employment." *Id.;* 20 C.F.R. § 655.102(b)(1)(vi). Domestic workers, such as the plaintiffs herein, are afforded free housing, including housing in family units, on the same basis as foreign H–2A laborers solely by operation of the implementing regulations promulgated pursuant to subsection 1188(c)(4). *See* 20 C.F.R. § 655.-102(a). Were the plaintiffs' position to prevail, H–2A employers would be required to afford temporary U.S. workers family housing under *all* circumstances in which free housing is provided, even if (as here) family housing is not the prevailing practice in the area and occupation of intended employment. 42 U.S.C. § 3604 thus would guarantee U.S. workers family housing to a far greater degree than—rather than to the same degree as—the family housing requirements of 8 U.S.C. § 1188(c)(4) and 20 C.F.R. § 655.-102(a).

Because the quantum of benefits 42 U.S.C. § 3604 would provide to U.S. workers is so much greater than what they would receive under 8 U.S.C. § 1188(c)(4), we believe that the statutes cannot be reconciled so easily as the plaintiffs suggest. According to subsection 1188(c)(4), family housing is not required of H–2A employers unless it is the prevailing practice in the area and occupation of intended employment. According to 42 U.S.C. § 3604, family housing is always required for U.S. workers. Both propositions cannot be true. We therefore agree with the district court that "[t]here is simply no way to harmonize [8 U.S.C. § 1188(c)(4)] with [42 U.S.C. § 3604]" on the basis of their language or legislative history. *Farmer v. Em-*

*ployment Sec. Comm'n,* No. 91–720–CIV–BR, slip op. at 7 (E.D.N.C. June 1, 1992) (order). Because the statutory requirements are incapable of coexistence in the factual context this case presents, it falls to us to decide which must prevail.

### III

The legislative histories of both 8 U.S.C. § 1188(c)(4) and 42 U.S.C. § 3604 are completely bereft of any mention of one another. Having determined that the statutes are in open conflict, we must seek their resolution by applying the basic tenets of statutory construction. Although the canons of construction are many, two are particularly relevant where overlapping statutes conflict: (1) the doctrine of repeal by subsequent enactment; and (2) the principle that statutes narrowly applicable to the circumstances at hand control over more generalized provisions. We therefore ask (1) whether Congress intended to effect the repeal of 8 U.S.C. § 1188(c)(4) when it enacted 42 U.S.C. § 3604; and (2) which provision is more closely associated with the specific substance of this controversy.

### A

When Congress passed the Immigration Reform and Control Act in 1986, the new statute clearly controlled whether participating H–2A employers were required to provide family housing to temporary laborers. The Fair Housing Act did not then proscribe discrimination based upon familial status.[17] To negate the controlling effect of the Immigration Reform and Control Act's family housing provisions, the Fair Housing Amendments Act of 1988 would have had to repeal 8 U.S.C. § 1188(c)(4) explicitly or implicitly. As we have observed, the language of 42 U.S.C. § 3604 reveals no intention to effect the explicit repeal of subsection 1188(c)(4). A search for signs of implicit repeal is equally fruitless. If Congress intended the 1988 amendments to repeal subsection 1188(c)(4) by implication, it failed to carve its intent on the tablets of legislative history. It is settled law that repeal of a statute by implication is

---

**17.** *See supra* notes 15–16 and accompanying text.

not favored. *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981); *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). Without some indication of legislative intent to guide us, we cannot find that 42 U.S.C. § 3604 implicitly repealed 8 U.S.C. § 1188(c)(4).

### B

■ It is a basic principle of statutory construction that when two statutes are in conflict, a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision. *See, e.g., HCSC–Laundry v. United States,* 450 U.S. 1, 6, 101 S.Ct. 836, 838, 67 L.Ed.2d 1 (1981) (per curiam). Deploying this principle, the Supreme Court has held that the narrower and earlier of conflicting statutes should prevail in a contest for control of a particular controversy:

> [A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." "The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all."

*Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976) (quoting *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974); T. Sedgwick, *The Interpretation and Construction of Statutory and Constitutional Law* 98 (2d ed. 1874)).

We agree with the district court that [8 U.S.C. § 1188(c)(4)] is an extremely narrow provision addressing whether growers in the H–2A program are required to provide housing. In contrast, [42 U.S.C. § 3604] is a very broad provision covering all housing in the United States.

*Farmer v. Employment Sec. Comm'n,* No. 91–720–CIV–5–BR, slip op. at 8 (E.D.N.C. June 1, 1992) (order). In addition, it is not necessary to consider the provisions of the Fair Housing Amendments Act of 1988 as "intended to affect" the Immigration Reform and Control Act of 1986 "in order that [the] words [of the former statute] shall have any meaning at all." *Radzanower,* 426 U.S. at 153, 96 S.Ct. at 1992. The familial-status discrimination amendments wield broad authority. Their provisions affect nearly every housing transaction that takes place in the United States. By declining to extend the amendments' reach to the free housing provided by participating H–2A farmers, we merely give effect, in an extremely narrow venue, to the more closely applicable provisions of the senior statute.

Under these circumstances, we conclude that 8 U.S.C. § 1188(c)(4) controls over 42 U.S.C. § 3604. We therefore hold that participating H–2A farmers must provide family housing to temporary agricultural laborers, whether foreign or domestic, only when such is the prevailing practice in the area and occupation of intended employment.

### IV

For the foregoing reasons, the judgment of the district court is hereby

***AFFIRMED.***